**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMES CHIZMAR and MARIANNE** | ) | |
| **CHIZMAR,** | ) | |
| **Plaintiffs,** | ) | **2:09-cv-188** |
| **v.** | ) | |
| | ) | |
| **BOROUGH OF TRAFFORD, FRANK** | ) | |
| **BRUNO, BRIAN LINDBLOOM and** | ) | |
| **CRAIG ALEXANDER,** | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Pending now before the Court is DEFENDANT CRAIG ALEXANDER'S MOTION

FOR SUMMARY JUDGMENT (Doc. No. 53), with Defendants' joint undisputed statement of

material facts and appendix (Doc. No. 58) and brief in support (Doc. No. 55); MOTION FOR

SUMMARY JUDGMENT BY DEFENDANTS BOROUGH OF TRAFFORD, FRANK

BRUNO, AND BRIAN LINDBLOOM (Doc. No. 56), with brief in support (Doc. No. 57);

PLAINTIFF'S RESPONSIVE CONCISE STATEMENT IN OPPOSITION TO DEFENDANTS'

MOTIONS FOR SUMMARY JUDGMENT (Doc. No. 62); and PLAINTIFFS' BRIEF IN

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. No. 63)

with appendix (Doc. No. 64).  In reply to Plaintiffs' responsive statement of material facts,

Defendants filed a response in opposition (Doc. No. 66), a reply brief to Plaintiffs' responsive

statement, and a supplemental appendix (Doc. No. 68).  The motions have been fully briefed and

are ripe for disposition.  After a careful consideration of the motions, the filings in support and

opposition thereto, the memoranda of the parties, the relevant case law, and the record as a

whole, the motions for summary judgment will be granted.

# Procedural Background

On February 13, 2009, Plaintiffs James Chizmar and Marianne Chizmar commenced this action by filing a five count complaint alleging multiple counts of intentional retaliatory conduct by Defendants: the Borough of Trafford ("Trafford" or "the Borough"), Kevin Karazsia (Mayor of Trafford)[1], Frank Bruno (Trafford councilman), Brian Lindbloom (Trafford Code Enforcement Officer), and Craig Alexander (solicitor of Trafford). Counts I, II, and IV allege violations of rights guaranteed by the United States Constitution, brought pursuant to 42 U.S.C. § 1983. Count I is captioned "Retaliation - 42 U.S.C. § 1983" and alleges numerous acts of unlawful retaliation in response to Plaintiffs exercise of the their rights protected by the First Amendment. More specifically, Plaintiffs allege that they suffered from retaliation after exercising their rights to raise "safety concerns and circulate petitions over the Bradford Square and Coventry Court developments" *see* Doc. No. 1 at ¶ 44, in that:

> Defendants [Borough of Trafford, Bruno, and Lindbloom] attempted to deter Plaintiffs from exercising their First Amendment Rights by:
>
> a. Directing that the hazardous diesel tank and offensive portable toilet be placed at the edge of their property;
>
> b. Issuing a meritless citation for violation of Section 136-3(F) and fining Plaintiffs $8,400.00, without probable cause;
>
> c. Filing an Equity Action without factual support or probable cause;
>
> d. Continuing the Equity Action for months after it was proved that Plaintiffs were not discharging foul or offensive liquid;
>
> e. Directing Trafford police to investigate Plaintiffs for meritless claims that they had pulled out property stakes; and

---

[1] Defendant Karazsia was dismissed from the action by stipulation of the parties, as ordered by the Court on February 12, 2010. Doc. No. 41.

       f.      Citing Plaintiff James Chizmar for disorderly conduct without probable cause.

Doc. No. 1 at ¶ 45.

Counts II and IV are both captioned "Retaliatory Prosecution - 42 U.S.C. § 1983." Count II is brought against the Borough and Defendants Bruno, Lindbloom, and Alexander, and refers to the complaint in equity filed by Defendant Borough against Plaintiffs in the Court of Common Pleas of Westmoreland County, Pennsylvania, on September 17, 2007,[2] whereas Count IV is directed to the criminal disorderly conduct citation/summons issued by the Trafford police against Plaintiff husband in August, 2008.

Counts III and V are brought pursuant to Pennsylvania law under supplemental jurisdiction. In Count III of the Complaint, Plaintiffs allege that Defendant Craig Alexander conspired with the other defendants to engage in the wrongful use of civil proceedings with the filing of a complaint in equity against Plaintiffs in Westmoreland County. Defendant Alexander, as solicitor of Trafford, prepared, verified, and filed the September 17, 2007 equity complaint.

### Factual background

This action revolves around the development of an area of land within the Borough of Trafford, and the resulting disharmony produced as a result of Plaintiffs' opposition to the development project. In February 2007, Trafford approved a residential subdivision and land development plan for two vacant parcels of land, one parcel to be developed as "Coventry Court" and one parcel to be developed as "Bradford Square". Generally speaking, the Coventry Court

---

[2] In that equity action, Defendants sought injunctive relief for the alleged storm drainage pipe discharge from the property owned by the Plaintiffs of a foul and offensive liquid in violation of Borough Ordinance 663, as amended by Ordinance 672, Chapter 136, Section 136-3(F).

project is a large tract of land on which a number of homes was to be built.  A portion of the Coventry Court site is behind and immediately adjacent to Plaintiffs' property.  An unimproved road extends through the Coventry Court parcel, and was situated directly behind Plaintiffs' property.[3]  The developer, Makenzie Land Partnership LP, owned the Coventry Court parcel, and commenced the construction of residential housing and a road in 2007.

Plaintiffs first became aware of the development at the end of April/beginning of May in 2007, when , in their words, the bulldozers arrived and began working.  From that date, a number of occurrences followed that involved Plaintiffs' various interactions with Defendants, the developer, law enforcement officials, and others that formed the factual background upon which Plaintiffs bring their claims.  The Court will describe the events *in seriatim*.

A.    Placement of diesel tank and portable toilet close to Plaintiffs' property

The earliest interaction involved the placement of a diesel fuel tank and a portable toilet near the edge of Plaintiff's property.  Plaintiffs were initially unaware that the property adjacent to theirs had been approved for development.  Once the work on the site commenced in April, a diesel fuel tank and a portable toilet were moved onto the construction site by the developer and placed close to, but not on, Plaintiffs' property, in plain view of the Plaintiffs' backyard.  On April 29, 2007, personnel from the Trafford Volunteer Fire Department reported to the construction site to investigate a report that the diesel tank was leaking.[4]  Despite making some

---

[3]    A 20' wide easement identified as a roadway, way, or alley in various deeds and subdivision plans with respect to the Plaintiffs' property and the Coventry Court parcel is situated behind and immediately adjacent to Plaintiff's property and forms the northern boundary of Plaintiffs' property.

[4]    The source of the initial report of leaking was not identified in the evidentiary record.  Plaintiffs, for their part, take no credit for this initial report, and were unaware of any

effort to stop the leak, including borrowing a pipe wrench from Plaintiff James Chizmar ("Plaintiff husband"), the leak was not entirely abated on that day. On April 30, 2007, the following day, Plaintiff Marianne Chizmar ("Plaintiff wife") left a voice mail message for Defendant Lindbloom. On May 1, 2007, Defendant Lindbloom telephoned Plaintiff wife in response to her voice mail message. In speaking with Defendant Lindbloom, Plaintiff wife complained about the placement of the portable toilet and the diesel fuel tank. She explained that the portable toilet was in plain view of her backyard. Plaintiffs' backyard contained a swimming pool and a volleyball net, and was used by Plaintiffs throughout the summer for outdoor entertaining. According to Plaintiff wife, she was informed that Defendant Lindbloom doubted anything could be done about it.[5] A couple of days later, the diesel tank and portable toilet were removed from the construction site. After several months, the diesel tank and portable toilet were apparently returned to the construction site in or around July, 2007. According to Plaintiffs, the two items were returned to the same location close to the edge of Plaintiffs' property. After the items were returned, Plaintiffs did not notice if any additional leaking occurred from the diesel tank. Further, at no time did Plaintiffs complain about any leakage or odors emanating from the portable toilet, either before it was moved or after it was returned. As the property owner, the developer of the construction site was, at all times, responsible for the location placement for the diesel tank and portable toilet.

---

leakage until fire department personnel had arrived.

[5]     Defendant Lindbloom recalled the conversation somewhat differently, and that he informed Plaintiff that he would contact the developer and request that they relocate the fuel tank and the portable toilet. For the purpose of this opinion, the Court considers the facts of this conversation in the light most favorable to Plaintiffs.

B.    Trafford police investigation into the removal of engineering stakes

That summer, the Trafford police department investigated a complaint regarding the removal of engineering stakes that had been driven into the ground on the construction site. The following investigative summary is included in a Trafford Police Department incident report dated July 23, 2007:

> 07/23/2007 07:00 ... [Officer] was met at the station by the [complainant] C/V who stated that they are continuing to have problems out at the construction site off of Hillcrest. The C/V stated they are now having problems with the engineering stakes being pulled out. The stakes are located on the right away [sic] right behind 148 7th Street Ext. According to the C/V, on Saturday July 21st workers at the site saw a male, who lives at 148 7th Street, pull the stakes from the ground. The C/V stated it costs him $100.00 dollars each time a stake is pulled. The C/V also adivsed that they are doing there [sic] best with working with the residents in the area and would like for this not to go any further because he doesn't want to cause any problems. However, he stated if these things continue they may want to look into pressing charges. I advised I would speak to the residents at 148 7th Street Ext and advise.
>
> ...
>
> Supplemental 07/23/2007 18:25 ... [Officer] spoke to Mr. And Mrs. Chizmar at 148 Seventh Street Ext. Pertaining to stakes being removed from the property line that was set in place by the construction co. owner. ... Mrs. Chizmar declined that they had any involvement in removing the 'No Trespassing' stakes. I spoke with Mr. Jim Chizmar on the phone whom stated, that the 'no trespassing' signs [are] on public easman [sic] is a violation. Both were advised that this is a civil problem that they will have to deal with through the Borough and not the construction co. ...

Doc. No. 54 at exhibit K. The above referenced "C/V" or complainant was Bo Chatfield, the site manager for the Coventry Court project, and an employee of the developer.

The following day, a two page letter sent by Plaintiff husband captioned "Trafford Borough Planning Commission Request for information and Appeal to Revoke Development Approvals" was received by the Borough. On July 27, 2007, Plaintiff husband followed his previously mailed letter with an electronic mail message to Defendant Alexander noting that "a

written request (i.e., for all development information and to schedule a Public Hearing, per letter dated 7/20/2007) was sent to the Borough on 7/24/2007" and he had yet to receive a response. *See* Doc. No. 54 at exhibit J.

C.      Drainage from Plaintiffs' property onto the developer's property

The discovery of a water drainage condition from Plaintiffs' property followed shortly thereafter. By way of background, the expert report filed by Plaintiffs in opposition to Defendants' motions for summary judgment included, in relevant part, the following history of the drainage system emanating from Plaintiffs' house:

> The Chizmars purchased the house with the Chizmar property in 1986. At the time the Chizmars purchased the Chizmar property, rain water from the roof of the house was collected in pipes and directed underground towards the rear of the Chizmar property where it was discharged and allowed to drain across the property line to the land which is now the Coventry Court Parcel. Mr. Chizmar has testified that he dug up what was apparently the original terra cotta pipe drainage system and replaced it with plastic drainage pipe. The original terra cotta drainage system directed rain water from the gutters and downspouts of the house to the rear of the Chizmar property. The current plastic drainage system serves the same purpose as the original terra cotta system.

Doc. No. 64 at exhibit B.

On or about August 2, 2007, and in the course of excavating the site in the area behind Plaintiffs' property for an area that was to become a public street to be called Coventry Lane Drive, a section of PVC pipe was uncovered by construction workers. Defendant Lindbloom was contacted by an employee of the developer and visited the site. Upon examination of the uncovered pipe, Defendant Lindbloom determined that it originated from the downspouts connected to the rain gutters on Plaintiffs' house, and that it was discharging a liquid into the ground. Defendant Lindbloom became concerned that the discharge could cause damage,

erosion, and sinkholes in or around Coventry Lane Drive.  He contacted the Trafford Borough

Engineer to examine the area and to provide his opinion about any possible effect the water run-

off would have on the adjacent property.   The Trafford Borough Engineer examined the area on

August 2 and 3, 2007, and concluded, *inter alia*, that if the condition were allowed to continue,

the road would suffer a premature demise because the presence of the diverted water from

Plaintiffs' property would prevent a proper foundation for the road from becoming firm and

would cause collapse.  Defendant Lindbloom received authorization from two Trafford Borough

council members, Defendant Bruno and Casey Shoub (not a party to this action), for the engineer

to contact Plaintiffs regarding the liquid discharge, which he did on August 3, 2007.  The

engineer wrote two identical letters, one to each Plaintiff, which:

> (a)    Notified Plaintiffs of the discharge of liquid from the rear of their property onto
>        the area that will become a Trafford street/public property (Coventry Lane Drive);
>
> (b)    informed them that the discharge resulted in an adverse impact affecting the street,
>        given the fact that the liquid prevents the subbase to solidify;
>
> (c)    indicated that the discharge violates the International Property Code, section 507,
>        which had been adopted by the Borough of Trafford[6];
>
> (d)    ordered Plaintiffs to remove the pipe within ten (10) days, as it was detrimental to
>        maintaining a safe and sound street;
>
> (e)    informed Plaintiffs that if they felt grieved by the order to remove the pipe, they
>        could petition the Trafford Council on August 7, 2007.

Also on August 3, 2007, Defendant Lindbloom posted the property with a "Notice of Borough

Ordinance Violation", which indicated that Plaintiffs were in violation of Nuisance Section 136-

---

[6]     This point was a misstatement, in that as of August 3, 2007, the Borough had not
adopted the International Property Code.  Instead, at that particular time, it had adopted the
BOCA National Property Maintenance Code. The Borough did, however, adopt the International
Property Code on March 18, 2008.

3, citing the water drainage.  Chapter 136 of the Borough code addresses nuisances, which are explicitly defined in Section 136-2 as "Any activity, conduct or condition which causes injury, damages, hurt, inconvenience, annoyance or discomfort to the public or such part of the public as necessarily comes into contact with such activity, conduct or condition and which adversely affects the same's safety, health, morals or general welfare, including aesthetics."  Section 136-3 prohibits nuisances within the Borough, and states:

> ... Nuisances shall include, but are not limited to the following:

> F.   The draining, or allowing to drain, by natural or artificial means, any foul or offensive liquid of any kind, from any premises into, upon or along any other premises, public right of way, or public lands, except where provision has been made for the lawful drainage of such liquid in such manner and at such place.  The existence of such drainage prior to the passage of this chapter, shall not make such activity or condition lawful.

Section 136-4 further requires Defendant Lindbloom, as the Code Enforcement Officer, with the duty to notify the owner of the property of the nuisance condition and set forth any corrective action required, upon the reasonable belief that a nuisance exists.  In this case, Plaintiffs were notified that if the drainage condition was not remedied within ten days, they would face fines of $100 per day.  At some point shortly thereafter, Plaintiff husband responded to the engineer by letter, objecting to the legal authority of the engineer to issue the order noted in the two letters, and that he "will be happy to discuss these issues as well as many other code violations by the Borough at this Tuesday's (i.e. August 7, 2007) council meeting and if necessary at the Westmoreland County Court of Common Pleas."

At the August 7, 2007, Trafford Council meeting, Plaintiff husband provided council with a petition of twelve (12) paragraphs, and a second document entitled "Objections to Coventry

Court Subdivision".  Further, during that meeting, Plaintiff husband spoke for over twelve (12) minutes, and Plaintiff wife also spoke, about the development.  However, Plaintiff husband did not raise any issue regarding the water drainage issue and the letter from the Borough engineer.

At the monthly public meeting conducted on September 4, 2007, Defendant Lindbloom provided an update to the council regarding the issue of the water draining from Plaintiffs' property, informing the council that several requests had been made to Plaintiffs regarding the issue to no avail, and that construction of the road cannot continue until the situation is resolved. Both Plaintiffs spoke at the meeting, yet neither voiced any comment about the water drainage. Their comments concerned the re-zoning of the Coventry Court development site from permanent preserve to residential, a topic that was raised and addressed separately at the same meeting.

In a letter to Plaintiffs dated September 5, 2007, Defendant Lindbloom reminded them of the seriousness of their continued failure to correct the drainage problem, alerting them of the accumulation of penalties in the form of fines until the situation is corrected, and noting the availability of the Borough Council, the Borough Code Enforcement Department, and the Borough engineer as possible sources of assistance available to Plaintiffs.  On September 17, 2007, Defendant Alexander, on behalf of Defendant Borough, filed a complaint in equity against Plaintiff husband and wife in the Court of Common Pleas of Westmoreland County, seeking injunctive relief to abate the water run-off.  On that same day, Defendant Alexander sent an electronic mail message to Plaintiff husband, attaching a copy of the complaint in equity, and further advising that the Borough would waive the pending fines and satisfy the equity action immediately if Plaintiffs corrected the water run-off condition.

Plaintiff husband responded to the September 5, 2007 Lindbloom letter with his own correspondence sent on September 19, 2007 (two days after the filing of the complaint in equity), informing Defendant Lindbloom that the pipe in question was disconnected on August 5, 2007. On September 26, 2007, Defendant Lindbloom responded with a letter informing Plaintiff husband that he had re-examined the property and found that the condition causing the water run-off remained.

On or around September 27, 2007, Defendants Lindbloom and Alexander met with counsel for the Chizmars in the equity action, a different counsel than counsel for the matter *sub judice*, to discuss a number of solutions for the drainage problem. This meeting was followed with a letter from Defendant Lindbloom to Plaintiffs on October 1, 2007 that suggested four alternative proposals to correct the drainage problem. In a letter dated October 4, 2007, counsel for Plaintiffs confirmed an agreement he had reached with the Borough in which the Borough would not take any further action against Plaintiffs, and would hold in abeyance the citations issued to Plaintiffs, pending possible amicable resolution of the matter.

On November 5, 2007, Defendant Lindbloom issued a non-traffic citation to Plaintiffs for the ordinance violation. Magisterial District Judge Helen M. Kistler conducted a hearing on January 14, 2008, and found in favor of Plaintiffs.

During this same period, counsel for the Chizmars filed preliminary objections on November 29, 2007. Plaintiffs objected to the legal sufficiency of the complaint in equity in the form of a demurrer, contending, *inter alia*, that the rain water discharged through the PVC pipe drainage system was not a "foul or offensive liquid" as referenced in section 136-3(F) of the Borough Code.

On December 7, 2007, Defendant Borough filed a motion for preliminary injunction in the equity action, seeking to enjoin the continuing violation of the liquid discharge from Plaintiffs' property. On February 8, 2008, Defendant Borough filed a motion for postponement of the equity action, and informed the court, *inter alia*, that the parties had agreed to perform a dye test on Plaintiffs' property, and that "if the dye test showed no leaching of water from the Chizmar property onto the street behind, this would likely resolve the matter and cause a withdrawal of the action." On February 27, 2008, Common Pleas Judge Gary P. Caruso granted the motion to postpone the equity action and rescheduled the argument on the Chizmars' preliminary objections to April 30, 2008.

On April 7, 2008, a dye test was performed on Plaintiffs' property, in which a powered dye was placed in the water collectors on the side of Plaintiffs' house, then flushed with approximately five gallons of water. Apparently, not enough water was used to complete the test. After a period of rain had occurred in the area, on April 11, 2008, Defendant Lindbloom returned to Plaintiffs' property and was able to photograph the dye emanating from Plaintiffs' property onto Coventry Lane Drive. In a letter dated April 28, 2008, the Borough engineer informed the Borough council of his findings and opinion regarding the results of dye test. Specifically, the letter noted the following:

> It is my professional opinion that both locations [from Plaintiffs' property] which currently discharge water run-off adversely impact the newly constructed street as follows:
>
> Water is seeping under and into the clay road base which produces a weak and spongy clay that is not allowed to solidify. As a result of this condition a premature demise of the pavement due to impact loadings from vehicles will occur. During the winter season this trapped water will accelerate the deterioration by freezing and expansion, which will allow the upward forces to disintegrate the flexible pavement.

> In addition, the water that collects on the surface presents a dangerous condition on the road itself when the water freezes.

In a hearing conducted on April 30, 2008, Judge Caruso overruled the preliminary objections of the Chizmars. Discussions continued between the Defendant Alexander and counsel for the Chizmars over the course of the summer, culminating in the developer's agreement to install a french drain at its own expense along the border of its property to divert the water drainage. On August 18, 2008, Judge Caruso granted a motion to continue the hearing scheduled for that day until October 24, 2008, in an order of court that also noted that in :the event that a drainage system is installed that remedies the current alleged violation, the plaintiff is granted leave to withdraw the complaint. The drainage system was installed by the developer shortly thereafter, and on August 27, 2008, Defendant Alexander withdrew the complaint in equity with consent on behalf of the Borough.

D.     Citation for disorderly conduct

As a part of the installation of the drainage system, the developer placed a number of large rocks in front of the drain in an effort to protect the drain from being driven over and damaged by motor vehicles. On Thursday, August 28, 2008, the day after the Borough filed its praecipe to withdraw the complaint in equity, Plaintiff husband sent the following to Defendant Alexander via email:

> Craig,
>
> Please be advised that [devloper] HET and Brian Lindbloom placing boulders across the rear of our proerty to deny us access doesn't solve any storm water issues. HET and ultimately Trafford Borough are required to management [sic] storm water according to Federal, State, and Local Laws. I'm sure you never intended for Judge Caruso to rule on this case, but only to cost us legal fees. I'm in contact with the authorities to make additional inspections of all HET violations at all their

development sites!  You should also be aware that Trafford Borough could loose [sic] Grant Money if they fail to enforce Stormwater laws.

Signed,

Jim and Marianne Chizmar.

On the morning of August 29, 2008, Lieutenant Carmen Disso of the Trafford Borough Police Department received a report from Defendant Bruno that one of the boulders protecting the drainage system directly behind Plaintiffs' property had been rolled onto the road on Coventry Court.  Lt. Disso, a second officer, and Defendant Bruno rolled the boulder back into place, and no further action was taken by the police with respect to that incident.  That night, Defendant Bruno positioned himself in the vicinity of the boulders in any attempt to see if the incident would recur, and if so, in order to identify who was responsible for moving the boulder.  According to Defendant Bruno, at some point between 9:30 p.m. and 9:45 p.m., he witnessed Plaintiff husband exit his house, proceed to the area of the boulders, and roll the same boulder back onto the road in Coventry Court.  Defendant Bruno proceeded to the police department and reported what he saw.

On August 29, 2008, Trafford Police Officer Douglas Sam cited Plaintiff husband with a summary non-traffic citation for disorderly conduct in violation of 18 Pa.C.S.A § 5503(a)(4).[7] On September 4, 2008, a summons was issued to Plaintiff husband to respond within ten days. Plaintiff husband notified the issuing authority that he intended to plead not guilty and forwarded

---

[7]    The Pennsylvania disorderly conduct statute states: "A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he: (1) engages in fighting or threatening, or in violent or tumultuous behavior; (2) makes unreasonable noise, (3) uses obscene language, or makes an obscene gesture, or (4) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor."  18 Pa.C.S.A. § 5503.

a check for $50.00 as collateral for his appearance. A summary trial was conducted on October 14, 2008 before District Judge Kistler, during which Defendant Bruno and Plaintiff wife testified. Plaintiff husband was found guilty of disorderly conduct, and sentenced to pay the fine within thirty (30) days, subject to Plaintiff husband's decision to pursue a statutory appeal. Plaintiff husband subsequently appealed the decision to the Court of Common Pleas of Westmoreland County, and on December 23, 2008, was found not guilty of disorderly conduct by Judge Richard E. McCormick, Jr.

## Standard of Review

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate "if the pleadings, the discovery and disclosure of material on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In deciding a summary judgment motion, the court must "'view the evidence ... through the prism of the substantive evidentiary burden' to determine 'whether a jury could reasonably find either that the plaintiff proved [their] case by the quality and quantity of evidence required by the governing law or that [they] did not.'" *Anderson v. Consolidated Rail Corp.*, 297 F.3d 242, 247 (3d Cir.2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' ... that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party has carried this burden, then the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the

material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct.

1348, 89 L.Ed.2d 538 (1986); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998

F.2d 1224, 1230 (3d Cir.1993). Thus, the non-moving party cannot rest on the pleadings, but

instead must go beyond the pleadings and present "specific facts showing that there is a genuine

issue of fact for trial." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n. 3 (3d

Cir.1998) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n. 1 (3d Cir.1994)).

Moreover, in considering a motion for summary judgment, a district court may not "make

credibility determinations or engage in any weighing of the evidence; instead, the non-moving

party's evidence 'is to be believed and all justifiable inferences are to be drawn in [their] favor.'"

*Marino v. Industrial Crating Co.*, 358 F.3d 241, 247 (3d Cir.2004) (quoting *Anderson*, 477 U.S.

at 255, 106 S.Ct. 2505); *see also Doe v. County of Centre, PA*, 242 F.3d 437, 446 (3d Cir.2001)

(holding that "a court must take the facts in the light most favorable to the nonmoving party, the

[Plaintiffs], and draw all reasonable inferences in their favor") (citation omitted).

### Discussion

Title 42, United States Code, section 1983 does not create substantive rights, but rather

provides a remedy for a violation of rights created by federal law or the Constitution of the

United States. 42 U.S.C. § 1983; *City of Okl. City v. Tuttle*, 471 U.S. 808, 816, 105 S.Ct. 2427,

85 L.Ed.2d 791 (1985). 42 U.S.C. § 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to be
> subjected, any citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action at law, suit in
> equity, or other proper proceeding for redress ...

In order to establish a prima facie case under § 1983, a plaintiff is required to demonstrate that: (1) a "person" deprived him or her of a federal right; and (2) the person who deprived him or her of said right acted under color of state or territorial law. *Connecticut v. Gabbert*, 526 U.S. 286, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999). If Plaintiffs have made out a prima facie case for the deprivation of a federal right under color of state law, then we must determine whether the Defendants, if any, must proceed to trial. The individual defendants can be held liable unless they are entitled to qualified immunity for their actions.

Plaintiffs make various claims that Defendants retaliated against them for exercising their rights under the First Amendment. *See generally*, Doc. No. 1. The First Amendment to the United States Constitution provides that "Congress shall make no law ... abridging the freedom of speech, or of the press, or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. Amend. I. The Amendment applies to the states, their political subdivisions, and agents thereof through the Fourteenth Amendment. *See Virginia v. Black*, 538 U.S. 343, 358, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003).

A.      Municipal Liability of Defendant Borough

The Court begins with the claims alleged against Defendant Borough at Counts I, II, and IV. Section 1983 claims against a municipality are significantly different than those against individual officials. The Supreme Court has held that municipalities and other local government units qualify as "persons" subject to liability under § 1983. *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, a municipality cannot incur § 1983 liability based on a theory of *respondeat superior*. *Id.* at 691, 98 S.Ct. 2018. Rather, § 1983 imposes liability only where a plaintiff identifies either "a policy statement, ordinance,

regulation or decision officially adopted and promulgated by that body's officers," or

"constitutional deprivations visited pursuant to governmental 'custom' even though such a

custom has not received formal approval through the body's official decision making channels."

*Id.* at 690-91, 98 S.Ct. 2018. The Court of Appeals for the Third Circuit has refined these

definitions, explaining that policy or custom may be established (1) "[w]hen a decisionmaker

possess[ing] final authority to establish municipal policy with respect to the action issues an

official proclamation, policy or edict," or (2) through a "course of conduct ... when, though not

authorized by law, such practices of state officials [are] so permanent and well-settled as to

virtually constitute law." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir.1990)

(citations and quotations omitted). These standards ensure that municipalities may incur liability

only for deprivations resulting from the decisions of "those officials whose acts may fairly be

said to be those of the municipality." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403-04,

117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *see also Banegas v. Hampton*, No. CIV.A. 08-5348,

2009 WL 1098845, at *3 (E.D.Pa. Apr. 22, 2009). For the reasons that follow, the Court will

grant summary judgment as to the individual Defendants on all claims both in their individual

and official capacities. As such, the Court finds that the evidentiary record fails to demonstrate

any further basis for municipal liability in terms of any policy statement, ordinance, regulation, or

decision officially adopted by Defendant Borough.

In terms of the state law claims brought against Defendant Trafford in Counts III and V,

under Pennsylvania law, a claimant seeking to impose liability on a local agency has the burden

of establishing: "(1) that a common-law or statutory cause of action exists against the local

agency as a result of a negligent act of a local agency or its employee acting within the scope of

his employment, 42 Pa.C.S.A. § 8542(a), and (2) that the negligent act falls within one of the eight exceptions to sovereign immunity enumerated in subsection 8542(b) of the Judicial Code, 42 Pa.C.S.A. § 8542(b)."[8] *See City of Philadelphia v. Glim*, 149 Pa.Cmwlth. 491, 613 A.2d 613, 616 (1992). Plaintiffs do not allege negligence within any of § 8542's enumerated categories. "Local agency" means "a government unit other than the Commonwealth government." 42 Pa. Cons.Stat. § 8501. A borough is a "local agency" under this statute. *See Amnesty America v. County of Allegheny*, 822 F.Supp. 297, 301 (W.D.Pa.1993).

Because Counts III and V allege intentional acts, § 8542(a) does not apply and Defendant Borough is entitled to absolute immunity. As stated in *Glim*:

> To the extent that Claimant has averred willful misconduct on the part of City employees, the unequivocal wording of subsection 8542(a)(2) of the Judicial Code, 42 Pa.C.S. § 8542(a)(2), bars Claimant's recovery from the City. Subsection 8542(a)(2) declares that liability may be imposed on a local agency only for negligent acts which subsection 8542(a)(2) defines as excluding acts or conduct which constitutes a crime, actual fraud, actual malice or willful misconduct.

*Glim*, 613 A.2d at 617. The Court will therefore dismiss the Plaintiffs' pendent state law claims at Counts III and V against Defendant Borough on the basis of the Borough's immunity.

B.    Official Capacity Liability of Defendants Lindbloom, Bruno, and Alexander

Defendants Bruno, Lindbloom, and Alexander move for summary judgment on all claims brought against them in their official capacity, and further contend that all claims alleged by Plaintiffs were brought against them exclusively in their official capacities, as opposed to being brought against them in their individual capacities, and therefore summary judgment as to all

---

[8]    A local agency may be liable for negligent acts within the following categories: (1) vehicle liability, (2) care, custody or control of personal property, (3) real property, (4) trees, traffic controls, and street lighting, (5) utility service facilities, (6) streets, (7) sidewalks, and (8) care, custody, and control of animlas. 42 Pa.Cons.Stat. § 8542(b).

claims is appropriate on that basis. *See* Doc. No. 55 at 18-19 (Alexander brief), and Doc. No. 57 at 5-6 (Bruno and Lindbloom brief). In support thereof, Defendants note that the complaint alleges that "[a]t all times material hereto, Defendants ... Bruno, Lindbloom, and Alexander acted as agents of Trafford, under the color of state law, and in conspiracy with one another", *see ,e.g*, Doc. No. 55 (quoting Doc. No. 1 at ¶ 10), and the specific conduct alleged "detail a pattern of retaliation and harassment which has been motivated by Defendants' desire, condoned by Trafford, to silence Plaintiffs' over the legitimacy of the Bradford Square and Coventry Court developments and to force them to move out of Trafford." *Id*. (quoting Doc. No. 1 at ¶ 41). Plaintiffs disagree with the notion that the individual Defendants were sued solely in their official capacities, and aver that the claims against Defendants Bruno, Lindbloom, and Alexander are also brought against them in their individual capacities. *See* Doc. No. 63.

Individual-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. *See, e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Scheuer v. Rhodes*, 416 U.S. 232, 237-238, 94 S.Ct. 1683, 1686-1687, 40 L.Ed.2d 90 (1974). Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018, 2035, n. 55, 56 L.Ed.2d 611 1978). On the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right. *See, e.g.*, *Graham*, 473 U.S. at 166. More is required in an official-capacity action, however, for a governmental entity is liable under § 1983 only when the entity itself is a "'moving force'" behind the deprivation, *Id*. (quotations omitted); thus, in an official-capacity

suit the entity's "policy or custom" must have played a part in the violation of federal law. *Monell*, *supra*; *Oklahoma City v. Tuttle*, 471 U.S. 808, 817-818, 105 S.Ct. 2427, 2433, 85 L.Ed.2d 791 (1985); *id.*, at 827-828, 105 S.Ct., at 2437, 2438 (Brennan, J., concurring in judgment). "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983". *Monell*, *supra.*, at 694.

In terms of the availability of defenses to liability, an official in a personal-capacity action may, depending on his position, be able to assert personal immunity defenses, such as objectively reasonable reliance on existing law. *See, e.g., Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) (absolute immunity); *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (qualified immunity); *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) (same). In an official-capacity action, however, these defenses are unavailable. *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980); *see also Brandon v. Holt*, 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). Additionally, punitive damages are not available under § 1983 from a municipality, *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), but are available in a suit against an official personally, *see Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983).

Plaintiffs' complaint does explicitly assert the capacity in which the causes of actions are brought against the individual Defendants, but that, in and of itself, does not impose a limitation

on Plaintiffs' claims. As the Supreme Court has recognized, however, that is not dispositive. In many cases, the complaint will not clearly specify whether officials are sued personally, in their official capacity, or both. *Graham*, 473 U.S. at FN 14. "The course of proceedings" in such cases typically will indicate the nature of the liability sought to be imposed. *Id.* (quoting *Brandon v. Holt*, 469 U.S. 464, 469, 105 S.Ct. 873, 877, 83 L.Ed.2d 878 (1985)). Upon review of the filings in this case, it is clear to the Court that Defendants Bruno, Lindbloom, and Alexander are not sued solely in their official capacities, but also in their individual capacities. Plaintiffs seek from each of them punitive damages, as well as compensatory damages. Further, Defendants Bruno, Lindbloom, and Alexander have each asserted, both in their answers to the complaint and in their respective motions for summary judgment, individual defenses that would not be available had the claims been limited to official capacity claims.

At the same time, however, the Supreme Court has stated that a suit under Section 1983 against a municipal officer in his or her official capacity is, in actuality, a suit against the municipality that the officer represents; an official capacity suit is essentially treated as a suit against the entity itself. *Graham*, 473 U.S. at 166.

Likewise, with respect to Plaintiffs' pendent state law claims, Defendants Bruno Lindbloom, and Alexander are not afforded the absolute immunity held by Defendant Borough for their intentional torts pursuant to 42 Pa.C.S. § 8550. This section provides:

> In any action against a local agency or employee thereof for damages on account of an injury caused by the act of the employee in which it is determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct, the provisions of section 8545 (relating to official liability generally), 8546 (relating to defense of official immunity), 8548 (relating to indemnity) and 8549 (relating to limitation on damages) shall not apply.

42 Pa.C.S. § 8550. For purposes of the Pennsylvania Judicial Code, the term "willful

misconduct" has the same meaning as the term "intentional tort." *See Delate v. Kolle*, 667 A.2d

1218, 1221 (Pa.Commw.1995), *app. denied*, 544 Pa. 677, 678 A.2d 367 (1996). It denies

immunity to the employees of local agencies, in this case Defendants Bruno, Lindbloom, and

Alexander, but does not deny immunity to Defendant Borough itself. *See Cooper v. City of

Chester*, 810 F.Supp. 618, 626 n. 8 (E.D.Pa.1992); *Glim*, 613 A.2d at 617.

Accordingly, summary judgment will be entered on Plaintiffs' Section 1983 claims

brought against Defendants Bruno, Lindbloom, and Alexander in their official capacities. The

remainder of the Court's analysis will consider the claims brought against the individual

Defendants in their personal capacities.

C.      Count I - First Amendment Retaliation

To establish a First Amendment retaliation claim predicated on 42 U.S.C. § 1983, a

plaintiff must prove the following elements: (1) constitutionally protected conduct; (2) that the

defendant took adverse action sufficient to deter a person of ordinary firmness from exercising

his rights; and (3) a causal connection between the two. *See Thomas v. Independence Twp.*, 463

F.3d 285, 296 (3d Cir. 2006); *Estate of Smith v. Marasco*, 318 F.3d 497, 512 (3d Cir. 2003);

*Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir.2003). There is also a fourth element required to

state a First Amendment retaliation claim premised on an investigation that leads to a decision to

prosecute: the absence of probable cause for the prosecution. *Hartman v. Moore*, 547 U.S. 250,

265-66, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006); *Miller v. Mitchell*, 598 F.3d 139, 154 (3d

Cir.2010) (probable cause element applies even where same individual acted as both investigator

and prosecutor).

In terms of protected activity, the Court notes that Plaintiffs' claims appear to interchange two rights protected under the First Amendment, the right to exercise the freedom of speech, and the right to petition the government. The United States Supreme Court has "recurrently treated the right to petition similarly to, and frequently overlapping with, the First Amendment's other guarantees of free expression." *McDonald v. Smith*, 472 U.S. 479, 490, 105 S.Ct. 2787 (1985) (Brennan, J., concurring). The Court notes that while the complaint itself does not specify in each instance which particular right under the First Amendment exercised by Plaintiffs triggered the retaliation, Defendants do not challenge the Plaintiffs' claims on the basis that they do not engage in protected activity with their efforts to publicly oppose the development.

In terms of the second element, the conduct of the governmental agent or body must be sufficient "to deter a person of ordinary firmness from exercising [their] First Amendment rights." *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir.2006) (citing *Suppan v. Dadonna*, 203 F.3d 228 (3d Cir.2000)). The "effect of alleged retaliation on protected activities need not be great in order to be actionable, but must be more than de minimus." *Kougher v. Burd*, 274 Fed. App'x 197, 200 (3d Cir.2008) (citing *McKee*, 436 F.3d 165, and expanding this principle beyond the employment context to actions by governmental actors on private citizens).

The crux of any claim for retaliation, particularly in the circumstances as averred by Plaintiffs, turns upon the third element, that of causation. In *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267-68 (3d Cir.2007), the United States Court of Appeals for the Third Circuit explained that courts must diligently enforce this causation requirement:

> A court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he

deemed appropriate and, in fact, was appropriate. Consequently, a putative plaintiff by engaging in protected activity might be able to insulate himself from actions adverse to him that a public actor should take. The point we make is not theoretical as we do not doubt that public actors are well aware that persons disappointed with official decisions and actions frequently bring litigation against the actors responsible for the decisions or actions in their individual capacities, and the actors surely would want to avoid such unpleasant events. Thus, it would be natural for a public actor to attempt to head off a putative plaintiff with the unwarranted expenditure of public funds. Courts by their decisions should not encourage such activity and, by enforcing the requirement that a plaintiff show causation in a retaliation case, can avoid doing so as they will protect the public actor from unjustified litigation for his appropriate conduct. In this regard we recognize that often public actors such as those in this case must make a large number of decisions in charged atmospheres thereby inviting litigation against themselves in which plaintiffs ask the courts to second guess the actors' decisions.

With this backdrop in mind, the court will consider Plaintiffs' claims in chronological order.

1.    <u>First Amendment Retaliation:  Placement of diesel fuel tank and portable toilet</u>

Plaintiffs allege that Defendants directed the developer of the Coventry Court construction site to place "the hazardous diesel tank and offensive portable toilet ... at the edge of their property". Doc. No. 1 at ¶ 45. More particularly, Plaintiffs allege that after complaining that the diesel tank and portable toilet posed safety hazards, construction work on the site was "temporarily halted" with the two items being removed, and that "[i]n the beginning of July 2007, the developer returned the diesel tank and portable toilet to the edge of Plaintiff's property" in retaliation for the earlier report. *Id.* at ¶¶ 15 - 16 & 18.  *Id* at ¶¶ 16 & 18.

The Court finds that there is not sufficient evidence in the evidentiary record, in fact, there is no evidence, upon which a reasonable fact finder could conclude that any Defendant directed the placement of the diesel tank and portable toilet close to Plaintiffs' property. According to the undisputed evidentiary record, on April 29, 2007, personnel from the Trafford Fire Company investigated a report that the diesel tank was leaking. The fire department

personnel attempted to stop the leak, and even borrowed a tool from Plaintiff James Chizmar in their effort to do so.  The next day, on April 30, 2007, Plaintiff Marianne Chizmar first initiated contact with any of the Defendants by leaving a voice mail message for Defendant Lindbloom asking that he return her call.  On May 1, 2007, two days after the fire department had been on scene attempting to stop the leak from the diesel tank, Defendant Lindbloom spoke with Plaintiff Marianne Chizmar by telephone.

No where do Plaintiffs cite any evidence to support the notion that any Defendant, or for that matter, any government official, had any input into the placement of the diesel tank and portable toilet.  Further, there is no evidence to suggest that the removal from the construction site and subsequent return to the site of the two objects was the product of any influence from any Defendant in response to Plaintiff wife's phone conversation with Defendant Lindbloom. Plaintiffs' own expert opined as much in a report attached to Plaintiffs' response in opposition. *See* Doc. No. 64, Plaintiffs' Appendix, at exhibit B (characterizing any possible claim Plaintiffs' may have regarding the two objects as "a private matter between the Chizmars and the owner of the Coventry Court Parcel.")  Any effort by Plaintiffs to blame Defendants for this is without any evidence in fact.

2.    First Amendment Retaliation: Police investigation into the removal of engineering stakes

In their complaint, Plaintiffs allege that in retaliation for a letter sent on July 24, 2007, Defendant Borough "sent a Borough police officer to Plaintiffs' home to investigate reports that Plaintiff Marianne Chizmar had pulled out property stakes in the Development, reports which were unfounded and false."  Doc. No. 1 at ¶ 24.  As the evidentiary record reveals, quite clearly in fact, the Trafford police, acting upon a report from the construction site manager employed by

the developer, conducted its brief investigation the day before the letter was sent by Plaintiff husband. Further, there is no evidence that any Defendant was aware of the report made by the construction manager. For these reasons, the notion of a causal connection collapses, as the so-called retaliatory action occurred prior to the triggering constitutionally protected activity. As such, Plaintiffs cannot satisfy the third element of a *prima facie* case of retaliation and summary judgment is appropriate. The remaining claims included in Count I are also raised as the factual bases for Counts II - V.

For the structure of the remaining analysis, the Court will consider the remaining factual averments and the alternative theories of recovery associated with each in turn.

D.    Counts I, II, and III - Ordinance violation citation and complaint in equity

Plaintiffs cite the August 3, 2007, non-traffic citation issued by Defendant Lindbloom notifying Plaintiffs of their violation of Borough ordinance 136-6, "nuisance", as an act of First Amendment retaliation (Count I) and retaliatory prosecution (Count II). Likewise, Plaintiffs cite the complaint in equity in the Court of Common Pleas in Westmoreland County for three of their claims, specifically as an act of retaliation in response to the expression of their First Amendment rights (Count I), an act of retaliatory prosecution (Count II), and as a wrongful use of civil proceedings (Count III).

The undisputed evidentiary record reveals that Plaintiffs were notified of their violation the Borough's nuisance ordinance by Defendant Lindbloom on August 3, 2007, for the water drainage condition, and that Defendant Borough, through Defendant Alexander, initiated the equity action on September 17, 2007, seeking, *inter alia*, to enforce its ordinances, and a preliminary and permanent injunction against the Chizmars. *See* Doc. No. 54 at exhibit X. The

undisputed evidentiary record further reveals that on or about August 27, 2008, Defendant

Borough withdrew the equity complaint and discontinued the action, following a resolution

agreed upon between the parties, wherein the developer (who was not a party to the equity

action) agreed to install a french drain on its property at its own expense in order to abate the

accumulation of water.  The Court will address the issuance of the citation and the equity action

under each theory of recovery *in seriatim*.

1.    First Amendment Retaliation:  Ordinance citation and complaint in equity (Count I)

As noted above, in order to prevail on their claim of First Amendment retaliation,

Plaintiffs must show that they engaged in protected activity, that Defendants' took retaliatory

action sufficient to deter a person of ordinary firmness from exercising constitutional rights, and

that a causal connection existed between the two.  Defendants do not dispute that Plaintiffs

publicly petitioned the Borough council at the monthly council meeting on August 7, 2007, nor

that on July 24, 2007, and again on July 27, 2007, Plaintiff husband corresponded with

Defendants requesting, *inter alia*, that all work be stopped and that a public hearing be conducted

to review the Coventry Court development's approval process.  As such, the evidentiary record

demonstrates that Plaintiffs engaged in a protected activity, and that the first element of a prima

facie case has been satisfied.

Moving to the second element, the Court finds that there is no basis to conclude that

Defendants' act of pursuing the complaint in equity was retaliatory in nature.  Quite the contrary,

Plaintiffs created a condition that required the attention of Defendants because it interfered with

the construction of what was to become a public road.  There is no dispute that it was an

employee of the developer who first uncovered the water drainage condition during the

excavation of the land as part of the road construction. Furthermore, there is no dispute that without the condition being abated, the water run-off from Plaintiffs' property onto the adjacent property would preclude the ground from properly solidifying and result in the premature demise of the new road. There is no dispute that Defendant Lindbloom was properly empowered with the authority to notify property owners (Plaintiffs) of a nuisance condition, and to direct correction of the condition, which he did on August 3, 2007. There is no dispute that Defendant Lindbloom and the Borough engineer offered to provide assistance to Plaintiffs to abate the condition. There is no dispute that Plaintiffs indicated to the Borough engineer that they would address the water drainage condition at the next regularly scheduled Borough council meeting, and yet subsequently opted not to do so at either the meeting held on August 7 or September 4, 2007. There is no dispute that Plaintiffs did not correct the problem prior to the filing of the complaint in equity by Defendant Alexander, despite repeated efforts by Defendants to alert Plaintiffs of the need for corrective action. There is no dispute that construction of the road could not be completed and turned over to the Borough as long as the condition continued. There is no dispute that on the day the complaint was filed, Defendant Alexander contacted Plaintiff husband and informed him that if the condition was corrected, the Borough would waive all fines up to that point and would discontinue the action. There is no dispute that Plaintiff husband responded to Defendant Lindbloom the next day that the condition had been corrected, which Defendant Lindbloom later discovered to be false.

Given this undisputed record, the Court finds that there is no basis to suggest that the action of issuing a notice of ordinance violation, filing a complaint in equity to abate, and pursuing said lawsuit until it was withdrawn by Defendant Borough, was retaliatory. Simply

stated, a party cannot take the legitimate business of a municipality hostage, for lack of a better way to describe it, by interfering with the property rights of a third party and violating a local ordinance because of a disagreement over decisions made by the Borough, and, at the same time, shield himself from culpability by summarily claiming retaliation. While official reprisal for protected speech offends the Constitution, *see Hartman*, 547 U.S. at 256, lawfully enforcing municipal ordinances through properly initiated legal action following unsuccessful attempts to resolve a patently obvious ordinance violation by lesser means does not. Said another way, Plaintiffs cannot establish that the action of Defendants was retaliatory when Plaintiffs not only knowingly and continually violated the Borough ordinance, they also left the Borough no other choice in response to the situation, other than to take no action and indefinitely halt construction (thereby providing Plaintiffs' their desired outcome), or require the road to be constructed on unstable ground.

By the same token, the undisputed evidentiary record further reveals no genuine issue of material fact as to the third element. The Court finds that Plaintiffs have failed to carry their burden with respect to causation. As the Supreme Court held in *Hartman*, "some official actions adverse to such a speaker might well be unexceptional if taken on other grounds, but when nonretaliatory grounds are in fact insufficient to provoke the adverse consequences, we have held that retaliation is subject to recovery as the but-for cause of official action offending the Constitution." 547 U.S. at 256 (citations omitted). The undisputed evidentiary record clearly demonstrates nonretaliatory grounds for both the ordinance citation and the complaint in equity. Further, and most fatal to Plaintiff's claims, Plaintiffs have adduced no evidence that but for retaliatory motivations, no action would have been taken by Defendants. At best, Plaintiffs

claim of First Amendment retaliation in this regard is structured as follows, 1) Plaintiffs publicly object to the Coventry Court development; 2) Defendants initiate an action in equity in the Court of Common Pleas; and 3) the equity action was caused by Plaintiffs' objections to the development. Such an argument amounts to nothing more than a "post hoc, ergo propter hoc" inference that is in itself insufficient. *Cf, e.g., Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir.1997) (although timing alone can be sufficient in a particular context, "the mere fact that adverse employment action occurs after [protected activity] will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events.") In this case, the sequence of events necessarily includes a precipitating continuous ordinance violation by Plaintiffs that essentially provoked and resulted in the alleged retaliatory act by the Borough.

The facts and circumstances before the Court appear to fit squarely within the cautionary concern articulated by the Third Circuit in *Lauren W.,* 480 F.3d 259, as an example of putative plaintiffs attempting to insulate themselves from entirely appropriate actions adverse to them by a public actor. "Courts by their decisions should not encourage such activity and, by enforcing the requirement that a plaintiff show causation in a retaliation case, can avoid doing so as they will protect the public actor from unjustified litigation for [the public actor's] appropriate conduct." *Id*. at 268. The Court's decision here will not encourage such behavior and will grant summary judgement fo Defendants in this regard.

2. <u>Retaliatory Prosecution:  Ordinance citation and complaint in equity (Count II)</u>

With Count II, sub-captioned "Retaliatory Prosecution - 42 U.S.C. § 1983", Plaintiff's allege "Defendants Trafford, Lindbloom, and Bruno, while acting under color of state law, attempted to deter Plaintiffs from exercising their First Amendment rights by inducing Defendant

Alexander to bring unsupported charges against Plaintiff for violating Trafford Ordinance Section 136-3(F) and continued pursuing prosecution of the violation by filing an equity action." Doc. No. 1 at ¶ 51.  In general, the United States Supreme Court has held that, in addition to the first three elements in a retaliation allegation noted *infra.*, the absence of probable cause must be alleged and shown by a plaintiff in a retaliatory prosecution claim for violation of the First Amendment.  *Hartman v. Moore*, 547 U.S. 250, 263, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006); *see also*, *Gagliardi v. Fisher*, 513 F.Supp.2d 457 (WD Pa. 2007).

Before turning to the question of whether probable cause existed here to justify Defendants' various acts, however, the Court must address a threshold issue not considered in *Hartman*, which is whether a civil action in equity to enforce a borough ordinance, such as the ordinance at issue, is criminal or civil in nature.  If the claim is considered criminal in nature, the retaliatory prosecution analysis as found in *Hartman* is applicable, and an actionable claim requires the absence of probable cause.  If civil in nature, however, the analysis would be the same as any other so-called retaliatory acts taken by government officials and caused by the constitutionally protected activity of the plaintiff.

The Court begins with the question of whether the August 3, 2007 notice of Borough ordinance violation issued by Defendant Lindbloom to Plaintiffs was criminal in nature to provide a basis for a retaliatory prosecution allegation.  Generally, violations of municipal codes or ordinances are summary offenses.  *Commonwealth v. Korn*, 650 A.2d 1176, 1178 (Pa.Cmwlth. 1994).  As such, a party charged and brought before a District Justice on such an offense is entitled to the same presumption of innocence and other rights accorded in criminal prosecutions generally, including application of a proof "beyond a reasonable doubt" standard.  *See*

32

*Commonwealth v. Wagaman*, 627 A.2d 735, 737 (Pa.Super. 1993)(due process burden of proof applies to summary offenses as well as to other criminal charges); *Commonwealth v. Karl*, 490 A.2d 887, 890-91 (Pa.Super. 1985)(same).

In this case, the notice provided by Defendant Lindbloom to Plaintiffs of the ordinance violation required Plaintiffs to take remedial action within ten (10) days or face fines of $100.00 per day. Under the Section 81-11 of the Trafford Borough Code, Defendant Lindbloom was authorized, as Code Enforcement Officer, to file a summons with the District Justice in order to pursue the matter as a summary criminal offense. The Court has little difficulty considering the notice of violation of the Borough nuisance ordinance, although technically a precursor to an actual citation, to be criminal in nature, and therefore, the issuance of such a notice may be actionable as a claim of retaliatory prosecution in response to an exercise of First Amendment rights. Accordingly, the analysis must consider the elements of retaliation, which are the same as the First Amendment retaliation outlined in Count I, with an additional fourth element of an absence of probable cause for the notice. For the same reasons as noted hereinabove as to Count I, the record fails to establish the second element for a claim of retaliatory prosecution, a retaliatory act, and the record fails to establish the third element, that of causation. Even if those elements had been satisfied, however, the undisputed evidence pertaining to the fourth element, which requires the absence of probable cause to issue the notice, is fatal to Plaintiffs' claim.

In opposing the motion for summary judgment, Plaintiffs argue that any determination as to the existence of probable cause is a question of fact better left to a jury, and therefore, summary judgment would not be appropriate. *See* Doc. No. 63. Generally speaking, Plaintiffs are correct, "the question of probable cause in a section 1983 damage suit is one for the jury."

33

*Montgomery v. De Simone*, 159 F.3d 120, 124 (3d. Cir.1998). However, a district court may determine whether probable cause exists as a matter of law, and hence grant summary judgment, if the evidence, when viewed in the light most favorable to the plaintiff, reasonably would not support a contrary factual finding. *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d.Cir.1997). Probable cause is assessed by examining the "totality of the circumstances" and adopting a "common sense" approach. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). It is well established that probable cause exists where "facts and circumstances [are] sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Sharrar v. Felsing*, 128 F.3d 810, 818 (3d. Cir.1997). In this regard, the Court finds that probable cause to believe that Plaintiffs were in violation of the Borough's nuisance ordinance existed as a matter of law. There is no dispute that Plaintiffs artificially redirected rain water run-off from their property into the ground of the adjacent property, thereby interfering with the construction of the road. Accordingly, the Court finds that summary judgment is appropriate on Count II as to the August 3, 2007, notice of ordinance violation, and the subsequent citation.

The Court next turns to the question of whether the complaint in equity pursued in the Cour of Common Pleas for Westmoreland County can form the basis for a retaliatory prosecution claim. For their part, Defendants incorporate the analysis of a sister U.S. District Court decision within the Third Circuit for the proposition that non-traffic citations for ordinance violations, and equity actions to enforce them, are criminal in nature. *See* Doc. No. 57, at § IV.B.1.a. (referencing *Grimm v. Borough of Norristown*, 226 F.Supp.2d 606, 655 (ED Pa. 2002)(order amended on technical grounds)). While Defendants' point is well-taken, the Court is not

34

persuaded that the rationale in that decision applies in this case. To be sure, the question of whether or not an action to enforce a municipal ordinance is civil or criminal in nature is not as simple as it may first appear.

For many years within the common law, an action brought by a municipality for the violation of a municipal ordinance was considered a civil suit for penalty, and the normal burdens of proof applied. *Commonwealth v. Whiteford*, 884 A.2d 364, 366 (Pa.Cmwlth, 2005). The issue was so well settled that in *Commonwealth v. Carter*, 377 A.2d 831 (Pa.Cmwlth. 1977), the Commonwealth Court noted:

> It has long been settled in this Commonwealth that an action instituted for violation of a municipal ordinance is a civil proceeding. ... As we stated in *City of Philadelphia v. Home Agency, Inc.*, 4 Pa.Cmwlth. 174, 177, 285 A.2d 196, 198 (1971): "'So many practitioners have been broken on the anvil of the principle settled by the cases cited, that we feel strongly that it should not be put in question again in this case.'"

*Id.*, 377 A.2d at 832. This was the case until the promulgation of an amendment to the Pennsylvania Rules of Criminal Procedure that changed the definitions under the rules that allowed that which was previously considered a civil suit for penalty to be considered penal in nature. As explained by the Pennsylvania Supreme Court in *Borough of West Chester v. Lal*, 493 Pa. 387, 391, 426 A.2d 603, 605 (1981), which involved a municipal ordinance that provided for the imposition of a fine or imprisonment in the county jail for a term not to exceed 30 days if violated:

> The Pennsylvania Rules of Criminal Procedure define "criminal proceedings" as including "all actions for the enforcement of the Penal Laws." Pa. R.Crim.P. 3(g). The penal laws include "any ordinances which may provide for imprisonment upon conviction or upon failure to pay a fine or penalty." Pa. R.Crim.P. 3(1). An ordinance is a "legislative enactment of a political subdivision." Pa. R.Crim.P. 3(g). These definitions (which were in effect in 1976) remove any doubt as to the nature

of the instant proceedings - they are criminal proceedings.

The Pennsylvania Supreme Court again addressed this issue in *In Re Investigating Grand Jury*,

496 Pa. 452, 460-461, 437 A.2d 1128, 1132 (1981):

> Under Rule 3, "criminal proceedings" include "all actions for the enforcement of the penal laws." Pa. R.Crim.P. 3(g). "Penal laws" are defined as "all statutes and embodiments of the common law which establish create or define crimes or offenses including any ordinances which may provide for imprisonment upon conviction or upon failure to pay a fine or penalty." Pa. R.Crim.P. 3(1). However, the inclusion of "ordinances which may provide for imprisonment upon conviction or upon failure to pay a fine or penalty" within the definition of "penal laws" does not make violations of such ordinances "crimes." Rather, it merely reflects the established principle that, in a civil action whose object is to penalize a civil defendant for the commission of an offense against the law, protections available to defendants in traditional criminal prosecutions may attach. (Citations omitted.)

Somewhat more recently, in *Town of McCandless v. Bellisario*, 551 Pa. 83, 709 A.2d 379, 381

(1998), the Pennsylvania Supreme Court addressed what level of due process protection was due

when municipal ordinances did not provide for imprisonment upon conviction or for the failure

to pay a fine:

> While the enforcement of municipal ordinances that provide for imprisonment upon conviction or failure to pay a fine or penalty must follow the Rules of Criminal Procedure, the same is not true for **municipal ordinances that do not provide for imprisonment upon conviction or failure to pay a fine or penalty**, which, by definition, **are not Penal Laws, and are therefore not included in the definition of "criminal proceedings."** Pa. R.Crim.P. 3. The higher degree of protection provided by the Rules of Criminal Procedure does not apply to municipal ordinance enforcement actions where imprisonment is not a remedy for a conviction or failure to pay a fine.

(emphasis added). Like *Bellisario*, the complaint in equity filed by Defendant Borough against

the Chizmars in this case was brought pursuant to Section 617 of the Pennsylvania Municipalities

Planning Code, Act of July 31, 2968, P.L. 805, as amended 53 Pa.C.S. § 10617. That section of

the Code merely provides for the issuance of a fine upon conviction, and does not provide for

imprisonment upon conviction or failure to pay a fine, therefore, the complaint in equity was civil in nature.

Admittedly, the differences between a claim of retaliatory prosecution, and those of other generally similar-sounding causes of action involving the legal process, including the torts of wrongful use of civil proceedings (raised by Plaintiffs in Count III against all Defendants), malicious prosecution (Count V), and abuse of legal process (not raised by Plaintiffs), are subtle. However, the decision in *Hartman v. Moore*, along with other retaliatory prosecution cases within this Circuit, including *Gagliardi v. Fisher*, 513 F.Supp.2d 457 (3d Cir. 2007), and *Merkle v. Upper Dublin School District*, 211 F.3d 782 (3d Cir. 2000), all involved situations in which an arrest was made by law enforcement and an actual criminal prosecution followed. Neither of which occurred here. Based upon this, and the fact that the Borough's nuisance ordinance does not provide for imprisonment in lieu of payment of a fine, the Court finds that the complaint in equity was civil in nature, and any allegation that it was "prosecuted" in retaliation for the exercise of constitutionally protected conduct, to use the phraseology of Count II, is no different than the allegation that it was "filed" and "continued" in retaliation for the same protected conduct, as alleged in Count I. Likewise, the Court notes that there are differences between the ordinance underpinning the complaint in equity alleged herein, with the ordinances found within the decision advanced by Defendants in support of their argument that the action was criminal in nature. The ordinance in *Grimm v. Borough of Norristown*, 226 F.Supp.2d 606 (ED Pa. 2002), and the cases cited therein, explicitly provided for imprisonment upon conviction of a violation. Neither the Trafford nuisance ordinance, found in chapter 136 of the Borough code, nor the code enforcement provisions, found in chapter 81 of the Borough code, provide for imprisonment.

Taken together, the Court finds that the claim of retaliatory prosecution in this regard is duplicative of the claims set forth in Count I, and as summary judgment will be granted in Count I, it is also appropriate for the allegations pertaining to the equity action in Count II.

The Court further notes that, even if the complaint in equity was criminal in nature, the existence of probable cause for Defendant Lindbloom to issue the notice of violation to Plaintiffs on August 3, 2007 would provide probable cause for the initiation and pursuit of the complaint in equity, and would therefore be just as fatal to Plaintiffs' claim. In sum, summary judgment is appropriate on Count II and will be granted.

3.      Wrongful Use of Civil Proceedings: Complaint in Equity (Count III)

Plaintiffs allege a state law claim against Defendants of wrongful use of civil proceedings for the initiation and prosecution of the equity action. More specifically, Plaintiffs allege that "Defendants initiated the Equity Action without probable cause, and continued to litigate the meritless claim made therein for months after it was conclusively established that Plaintiffs were not discharging any foul or offensive liquid." Doc. No. 1 at ¶ 58. Defendants contend summary judgment is appropriate on a number of grounds.

The Court agrees that summary judgment is appropriate. As an initial note, summary judgment will be granted on behalf of Defendant Borough based upon its absolute immunity. For the same reason, summary judgment will be granted for Defendants Bruno, Lindbloom, and Alexander for the claims in Count III brought against them in their official capacities. Remaining is consideration of Plaintiffs' claim of wrongful use of civil proceedings as alleged against the individual Defendants in their personal capacities.

Count III is brought under Pennsylvania law, the tort of wrongful use of civil proceedings,

codified as the Dragonetti Act, 42 Pa.C.S.A. § 8351, which provides as follows:

> (a) Elements of action. A person who takes part in the procurement, initiation or continuation of civil proceedings against another is subject to liability to the other for wrongful use of civil proceedings:
>
> > (1) He acts in a grossly negligent manner or without probable cause and primarily for a purpose other than that of securing the proper discovery, joinder of parties or adjudication of the claim in which proceedings are based; and
>
> > (2) The proceedings have terminated in favor of the person against whom they are brought.

This tort is interpreted and applied broadly against those who use legal process as a "tactical weapon to coerce a desired result that is not the legitimate object of the process." *Gen. Refractories v. Fireman's Fund Ins.*, 337 F.3d 297 (3d Cir.2003) (quoting *McGee v. Feege*, 517 Pa. 247, 535 A.2d 1020, 1026 (1987)).

The Court finds Plaintiffs cannot sustain either element of the tort, and will enter summary judgment accordingly. The Court will address each element in turn.

As to the first element, the Court finds that the alleged basis for the equity action indicates that the process used by the individual Defendants was not for a purpose other than that obtainable from the procedure itself. The first element has two sub-parts: (a) Defendants must have acted either in a grossly negligent manner or without probable cause; and (b) Defendants must have acted for an improper purpose. As stated by the Pennsylvania Supreme Court:

> The improper purpose usually takes the form of coercion to obtain collateral advantage, not properly involved in the proceeding itself such as the surrender of property or the payment of money by the use of the process as a threat or a club. There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the assurance of the process itself, which constitutes the tort (internal citations omitted).

*In re Larsen*, 616 A.2d 529, 592-93 (Pa. 1992), cert. denied, 510 U.S. 815, 114 S.Ct. 65, 126

L.Ed.2d 34 (1993); *see also*, *Pellegrino Food Products Co., et al., v. City of Warren, et al.*, 136 F.Supp.2d 391 (WD Pa. 2000). Here, there is no evidence to support the notion that the complaint in equity sought to accomplish anything other than the intended purpose, specifically the abatement of the artificial diversion of water from Plaintiffs' property onto the adjacent property. To that end, the Court notes that the undisputed evidence of the message sent to Plaintiffs by Defendant Alexander on the date that the equity complaint was filed in Westmoreland County, was a specific offer to withdraw the equity action and waive all fines should the Plaintiffs correct the condition, an offer Plaintiffs chose not to accept. Further, the Court notes that the agreement to postpone argument on the preliminary objections to the complaint was based upon an agreement by the parties in February of 2008 to conduct a dye test, with the stated intention that if the results of such test were favorable to the Chizmars, that the Defendant Borough would withdraw the complaint. As these uncontroverted facts make clear, the purpose of the complaint in equity, and the manner by which Defendant Borough litigated the matter, sought no purpose other than the correction of the condition.

Even if, *arguendo*, there was a genuine issue of material fact as to the first element, which there is not, Plaintiffs' claim would fail on the second element. In considering the question of "favorable termination" in a wrongful use of civil proceedings case, Pennsylvania courts have held that a withdrawal of proceedings stemming from a compromise or agreement does not, as a mater of law, constitute a termination favorable to the party against whom proceedings have been brought originally. *See D'Elia v. Folino*, 933 A.2d 117, 122 (Pa.Super. 2007); *see also*, *Rosenfield v. Pennsylvania Auto. Ins. Plan*, 636 A.2d 1138, 1142 (Pa.Super. 1994). When the parties to the underlying suit agree jointly to end the suit in a non-litigious manner, the liability of

the underlying defendants, *i.e.*, the Plaintiffs in this action, is never determined with finality.

*D'Elia*, 933 A.2d at 123 (citing *Electronic Lab. Supply Co. v. Cullen*, 712 A.2d 304, 311

(Pa.Super. 1998). Therefore, the underlying suit is not a "favorable termination" within the

meaning of 42 Pa.C.S.A. § 8351. Although there was no monetary payment made between

Plaintiffs and Defendant Borough, as in a typical legal "compromise", there is no dispute that the

agreement reached between the two parties ended the underlying equity suit. Consequently, it is

undisputed that Plaintiffs' liability, or lack thereof, was never determined with finality. As such,

Plaintiffs were not the 'victors' in the equity action, and they cannot, as a matter of law, prevail

against Defendants in a wrongful use of civil proceedings suit. *See id.*, 933 A.2d at 122-23. The

Court finds that Count III is without merit, and summary judgment is appropriate for the

Defendants.

E.      Counts I, IV, and V - Citation for Disorderly Conduct

        Plaintiffs cite the August 29, 2008, non-traffic citation accusing Plaintiff husband of

disorderly conduct in violation of 18 Pa.C.S. § 5503 as acts of First Amendment retaliation

(Count I), retaliatory prosecution for the exercise of First Amendment protected activity (Count

IV), and a state law malicious prosecution claim (Count V). The Court will address each of

Plaintiffs' theories of recovery.

1.      First Amendment Retaliation: Citation for Disorderly Conduct (Count I and IV)

        In Count I, Plaintiffs reference the non-traffic citation and summons which alleged a

violation of 18 Pa.C.S. § 5503(a)(4), disorderly conduct, that was mailed to Plaintiff husband on

September 30, 2008, as an act in retaliation "because they questioned Trafford over the approval

of the Development, raised safety concerns and requested that construction efforts cease until

such concerns could be addressed." Doc. No. 1 at ¶¶ 43 - 48. Count IV further alleges that the citation was an act of retaliatory prosecution in response to the exercise of Plaintiff husband's "right to raise and discuss his safety concerns and circulate petitions over the Bradford Square and Coventry Court developments" and was unsupported by probable cause. *Id.* at ¶¶ 61 - 68. Consistent with the Supreme Court's analysis in *Hartman*, *supra*, the Court will consider these two claims together, as the alleged retaliation under these particular facts resulted in a summary conviction before a district justice and the imposition of a fine. In order to demonstrate a prima facie case of retaliation, the evidentiary record must demonstrate the three elements of protected conduct, retaliatory act by a state actor, and causation, as well as the fourth element of the absence of probable cause. *Hartman*, 547 U.S. at 265, 126 S.Ct. 1695 ("[A] retaliatory motive on the part of an official urging prosecution combined with an absence of probable cause supporting the prosecutor's decision to go forward are reasonable grounds to suspend the presumption of regularity behind the charging decision, (citation omitted) and enough for a prima facie inference that the unconstitutionally motivated inducement infected the prosecutor's decision to bring the charge.") For the reasons that follow, summary judgment will be granted on Plaintiffs' claims that the disorderly conduct citation was retaliatory.

The threshold requirement is that the plaintiff identify the protected activity that allegedly spurred the retaliation. *Eichenlaub v. Township of Indiana*, 385 F.3d 274, 282 (3d Cir. 2004). In terms of protected activity, Plaintiffs' complaint refers solely to exercises of First Amendment speech that occurred in 2007 prior to the filing of the complaint in equity on September 17. *See, e.g.,* Doc. No. 1 at ¶¶ 14 (complaints to Defendant Lindbloom regarding the diesel fuel tank and portable toilet), 20 (Plaintiffs began circulating a petition in the summer of 2007 opposing the

development), 22 (on July 24, 2007, Plaintiffs sent a letter requesting information and requesting a hearing), and 27 (Plaintiffs' petition was denied at the August 7, 2007 council meeting). Further, Plaintiffs' brief in opposition to Defendants' motion for summary judgment likewise referenced the same protected activities in the same time period, and did not cite any further examples of protected speech. Doc. No. 63.

The following facts are not in dispute. Plaintiffs appeared and spoke at the public council meeting on August 7, 2007 (a meeting during which they also presented a petition), and again on September 4, 2007, generally expressing their opposition to the Coventry Court development. On September 17, 2007, the complaint in equity action was initiated by Defendant Borough against the Chizmars for the artificial diversion of rain water from Plaintiffs property onto the adjacent property. Also on September 17, 2007, Defendant Alexander forwarded a copy of the complaint in equity to Plaintiffs, generally expressing a reluctance to proceed, and offering to waive the fines and discontinue the action upon Plaintiffs' agreement to correct the condition. On September 18, 2007, Plaintiff husband corresponded with Defendant Lindbloom and falsely claimed that the pipe diverting the water had previously been disconnected, a claim that Defendants learned was not true. Nevertheless, in the equity complaint, Defendants worked with counsel for the Chizmars to resolve the condition, and, in furtherance of those efforts, agreed to an open-ended extension for Chizmar's counsel to respond to the complaint. The litigation proceeded until the ultimate resolution under which the non-party developer installed a french drain in its property in August, 2008 in order to abate the water condition. Given the fact that the water was diverted from Plaintiffs' property onto the adjacent property, the french drain was installed just outside the rear border of Plaintiffs' property and on the developer's property.

Boulders were placed around the location of the drain in order to protect it from automobile traffic damage.

On the morning of August 29, 2008, the Trafford police received a report that one of the boulders directly behind Plaintiffs' property had been rolled onto the street, creating a potentially hazardous condition. The boulder was rolled back into place by the police. That same evening, Defendant Bruno stationed himself in a position to see the boulders, and subsequently reported to the Trafford police that he witnessed Plaintiff husband rolling the boulder back into the street. This report resulted in the non-traffic citation/summons issued to Plaintiff husband.

Plaintiffs' claim that the citation was in retaliation for their protected activity fails at the third element, that of causation. Causation may be proved in various ways. A showing of "unusually suggestive" temporal proximity between the protected activity and the adverse action can be sufficient. *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 369 (3d Cir.2008). However, unless the "timing of the alleged retaliatory action [is] 'unusually suggestive' of retaliatory motive," additional evidence of causation is required to satisfy this element. *Estate of Smith v. Marasco*, 318 F.3d 497, 512 (3d Cir. 2003)(quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir.1997)). Lastly, a plaintiff can seek to prove causation by pointing to the record as a whole for evidence that suggests causation. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir.2000).

Plaintiffs have identified no evidence to support the notion that but for their protected activity, Plaintiff husband would not have been cited. To the contrary, Plaintiffs' open opposition to the development at council meetings occurred a year prior, and preceded the entire sequence associated with the complaint in equity. Therefore, the Court finds that the passage of

44

almost twelve months between the protected activity and Defendant Bruno's report to the Trafford police regarding the boulder is not unusually suggestive temporal proximity to satisfy the causation element. Likewise, Plaintiffs have adduced no additional evidence to demonstrate retaliatory animus by any of the Defendants. Instead, Plaintiffs attribute the alleged retaliatory animus from the fall of 2007 to the disorderly conduct citation/summons mailed to Plaintiff husband on August 30, 2008. Considering that evidence, however, reveals no pattern of retaliatory animus on the part of Defendants, but continuous efforts on their part to resolve the ordinance violation in the least intrusive manner to Plaintiffs.

At best, Plaintiffs' claim is premised on the suggestion that Defendant Bruno orchestrated the disorderly conduct citation/summons by falsely reporting Plaintiff husband's involvement in the second boulder incident to the Trafford police. Even if that was the case, however, it requires one step too far to infer that any such false report was caused by retaliatory animus for Plaintiffs' protected activity that occurred twelve months prior. Plaintiffs do not dispute the report that one of the boulders had previously been rolled onto the street and was discovered earlier that morning, and that the boulder on the street created a hazardous condition. Further, Plaintiffs do not dispute that a boulder was rolled into the street a second time. Plaintiffs simply contend that Defendant Bruno blamed the second incident on Plaintiff husband in retaliation for the opposition to the development. While Plaintiffs are free to assume that every subsequent act involving officials from the Borough is in retaliation for their protected speech, at this stage of the litigation, they are required to show evidence of causation, which they have not done. *Cf Barshinger v. Buffington*, 2004 WL 3607974 (M.D. Pa 2004)("Although [plaintiff] complained to city officials before many of the citations were issued, **this alone** does not support a clam of

45

improper motive.")(emphasis added).

Even assuming that the causation element had been satisfied, Plaintiffs would fail on the fourth element, the requirement to show a lack of probable cause. In addition to the undisputed facts that boulders had been rolled onto the street on two separate occasions, the record documents the summary trial on the citation before District Judge Helen M. Kistler on October 14, 2008, during which Judge Kistler heard sworn testimony from Defendant Bruno and Plaintiff wife. Plaintiff husband did not testify during that proceeding. Defendant Bruno not only testified as to what he saw that evening, but also was cross examined by the criminal defense attorney for Plaintiff husband. Likewise, Plaintiff wife provided alibi testimony for Plaintiff husband. At the conclusion of that hearing, Plaintiff husband was found guilty of the summary offense by Judge Kistler and sentenced to pay a fine.

Plaintiff husband points to his appeal of that conviction in the Court of Common Pleas of Westmoreland County on December 23, 2008, as evidence of the lack of probable cause. During Plaintiff husband's summary appeal hearing before the Honorable Richard E. McCormick, Jr., his counsel moved to dismiss the complaint at the conclusion of the government's case. The motion was denied. After which, Plaintiff wife again provided alibi testimony for her husband. Plaintiff husband did not testify. Upon the close of the evidence by the defense, Judge McCormick found Plaintiff husband not guilty. The existence of reasonable doubt, however, does not mean probable cause was lacking to cite Plaintiff husband in the first place.

The probative weight that a magistrate-level conviction has on the existence or lack of probable cause is an open question in First Amendment retaliatory prosecution claims. The Restatement (Second) of Torts states: "(1) The conviction of the accused by a magistrate or trial

court, although reversed by an appellate tribunal, conclusively establishes the existence of probable cause, unless the conviction was obtained by fraud, perjury or other corrupt means." Restatement (Second) of Torts § 667. In support of the rule that a conviction can be conclusive evidence of probable cause, the Restatement cites numerous state-court decisions. *See, e.g., Alexander v. Laman*, 225 Ark. 498, 283 S.W.2d 345 (1955); *Bealmear v. Southern Cal. Edison Co.*, 22 Cal.2d 337, 139 P.2d 20 (1943); *Addington v. Bates*, 101 Colo. 293, 73 P.2d 529 (1937); *Rogers v. W.T. Grant Co.*, 326 So.2d 57 (Fla.App.1975); *Hartshorn v. Smith*, 104 Ga. 235, 30 S.E. 666 (1898); *Adams v. Bicknell*, 126 Ind. 210, 25 N.E. 804 (1890); *Early v. Harry's IGA, Inc.*, 223 Kan. 32, 573 P.2d 572 (1977); *Taylor v. Nohalty*, 404 S.W.2d 448 (Ky.1966).

Pennsylvania has historically accepted the general rule that a conviction, even one in a summary proceeding that is later overturned on appeal, is sufficient proof of probable cause. *See, e.g., Lynn v. Smith*, 193 F.Supp. 887 (W.D. Pa. 1961); *see also,* 86 A.L.R.2d 1090. However, that general rule has been refined within the Third Circuit to the extent that state-law convictions overturned on appeal do not "conclusively establish probable cause and necessarily negate any possibility" that a plaintiff could establish a § 1983 claim. *Montgomery v. DeSimone*, 159 F.3d 120, 122 (3d Cir.1998); *cf. Ashford v. Bartz*, No. 04-643, 2006 WL 208802 (M.D.Pa. Jan.26, 2006) (declining to dismiss false arrest charges on the ground that the district justice found that probable cause existed for the arrest and that plaintiff was guilty of disorderly conduct because such evidence, while "highly probative evidence that Defendants had probable cause to arrest Plaintiff ... is not dispositive as a matter of law.")

On this record, the conviction of Plaintiff husband, coupled with the lack of evidence to demonstrate causation on the part of Defendant Bruno (or any other Defendant) and the lack of

any other evidence of the want of probable cause, the Court finds no lack of probable cause sufficient for Plaintiffs' claims to survive the grant of summary judgment.

Taken these considerations together, the Court finds that summary judgment is appropriate on Count I as pled regarding the disorderly conduct citation, and on Count IV.

2.  Malicious Prosecution: Citation for disorderly conduct (Count V)

Count V, Plaintiffs' claim of malicious prosecution, is both factually and logically similar to their claims in Counts I and IV.  To maintain a claim for malicious prosecution under Pennsylvania law, a plaintiff must prove that (1) defendants initiated a criminal proceeding against the plaintiff; (2) without probable cause; (3) the criminal proceeding terminated favorably to plaintiff; and (4) defendants acted maliciously or for a purpose other than bringing the plaintiff to justice.  *Kelley v. General Teamsters Local 249*, 518 Pa. 517, 544 A.2d 940, 941 (1988) (citing *Miller v. Pa. R. Co.*, 371 Pa. 308, 89 A.2d 809, 811 (1952)); *see also Hilfirty v. Shipman*, 91 F.3d 573, 579 (3d Cir.1996) (citing *Haefner v. Burkey*, 534 Pa. 62, 626 A.2d 519, 521 (1993), disapproval on other grounds noted in *Merkle*, 211 F.3d at 782; *Lee v. Mihalich*, 847 F.2d 66, 69-70 (3d Cir.1988)).  The plaintiff bears the burden of proving lack of probable cause in a malicious prosecution action. *Miller*, 89 A.2d at 811 (citation omitted).  "Probable cause has been defined as a reasonable ground of suspicion supported by circumstances sufficient to warrant an ordinary prudent man in the same situation in believing that the party is guilty of the offense." *Id.* at 811-12 (citation omitted).

For the same reasons as noted above, the Court finds that the evidentiary record does not satisfy Plaintiff husband's burden in terms of the absence of probable cause.  As noted, the evidence produced by Plaintiff husband does not establish a lack of probable cause.  To the

contrary, the record reveals a prior judicial determination of the existence of probable cause through a finding of guilt beyond a reasonable doubt. Notwithstanding the fact that Plaintiffs disagree with Defendant Bruno's testimony, Plaintiff husband has failed to show that the determination of Judge Kistler was obtained by false and/or fraudulent testimony, or by some other means sufficient to obliterate her initial determination. There is a subtle but distinct difference between evidence of alibi, which Plaintiff husband offers now just as he did previously, and evidence evincing a lack of probable cause. The record reveals evidence that the boulder was pushed into the road on the evening. An eyewitness, Defendant Bruno, reported to the police having seen Plaintiff husband roll the boulder into the street. The police had been to the same location earlier that day and returned the boulder to its original location after it had been rolled into the street the night before. Defendant Bruno provided a statement to the effect that he witnessed Plaintiff husband committing the act forming the basis of the charge. Defendant Bruno testified before the District Justice as to what he saw. Plaintiff wife also provided alibi testimony for her husband. The Court is also mindful of the Plaintiff husband's discovery response during this action when specifically questioned whether he did, in fact, roll the boulder into the street, to which he stated something to the effect that he could not remember one way or the other. Taking the quantum of evidence contained within this record into account, the Court finds that Plaintiffs have failed to establish a lack of probable cause. Introducing evidence sufficient that ultimately amounts to reasonable doubt on summary appeal does not equate to a lack of probable cause in the first place. Accepting Plaintiff husband's theory of recovery would amount to the Court's acceptance of that notion. For this reason, summary judgment will be granted to Defendants on Count V.

**Conclusion**

For the reasons hereinabove stated, the Court finds that Plaintiffs have not demonstrated by any record evidence that Defendants retaliated against them for the exercise of their protected constitutional rights, nor that Defendants wrongfully used civil proceedings or maliciously prosecuted Plaintiff. Therefore, the Motions for Summary Judgment of Defendants Alexander, Borough of Trafford, Bruno, and Lindbloom will be granted. An appropriate Order follows.


McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMES CHIZMAR and MARIANNE CHIZMAR,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **2:09-cv-188** |
| **v.** | ) | |
| | ) | |
| **BOROUGH OF TRAFFORD, FRANK BRUNO, BRIAN LINDBLOOM and CRAIG ALEXANDER,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER OF COURT**

AND NOW, this 29th day of March, 2011, in accordance with the foregoing memorandum opinion, it is ORDERED, ADJUDGED, and DECREED that DEFENDANT CRAIG ALEXANDER'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 53) and MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS BOROUGH OF TRAFFORD, FRANK BRUNO, AND BRIAN LINDBLOOM (Doc. No. 56) are GRANTED in their entirety.

It is further ORDERED that Plaintiffs' Complaint is dismissed with prejudice. The clerk shall docket this case closed.

BY THE COURT:

s/ Terrence F. McVerry
United States District Court Judge

cc:    Ronald D. Barber, Esquire
       Email: rbarber@smgglaw.com
       Amy E. McCall, Esquire
       Email: amccall@smgglaw.com

       John M. Giunta, Esquire
       Email: jgiunta@c-wlaw.com

Joseph S.D. Christof , II, Esquire
Email: jchristof@dmclaw.com
Michael P. Flynn, Esquire
Email: mflynn@dmclaw.com